Robert W. Ottinger (SBN 2744852)
Olivia Davis (SBN 6006456)
Allison Marculitis (SBN 5995311)
**THE OTTINGER FIRM, P.C.**
195 Montague Street, 14th Floor
Brooklyn, NY 11201
Tel: 212-571-2000
Fax: 212-571-0505
robert@ottingerlaw.com
olivia@ottingerlaw.com
allison@ottingerlaw.com

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IGOR ABRAMOV, <br><br> Plaintiff, <br><br> vs. <br><br> CAPULA INVESTMENT US LP and CAPULA INVESTMENT MANAGEMENT LLP, <br><br> Defendants. | **Civil Action No.:** 1:25-cv-9163 <br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

1    Plaintiff, IGOR ABRAMOV ("Plaintiff" or "Mr. Abramov"), by and through his attorneys, The

2    Ottinger Firm, P.C., complaining of CAPULA INVESTMENT MANAGEMENT LLP ("CIM") and

3    CAPULA INVESTMENT US LP (together with CIM, "Capula" or "Defendants"), alleges as follows:

4    **PRELIMINARY STATEMENT**

5    1.    Mr. Abramov brings this action against his former employer, Capula, for wrongful

6    termination in retaliation for Mr. Abramov's protected whistleblowing activities. Plaintiff was

7    employed by Capula as U.S. Chief Compliance Officer and Head of U.S. Compliance and Legal

8    and engaged in protected activity by raising concerns about significant regulatory compliance

9    issues. Those issues included certain undisclosed and improper expenses charged by Capula to

10   the investors in the Capula Multi-Strategy Master Fund Limited ("MS Fund"), certain improper

11   cross trading and capital allocations by Capula of the assets of the Capula Global Relative Value

12   Fund (the "GRV Fund") to the detriment of the GRV Fund investors, and "test trades" that

13   unduly risked investor assets in the MS Fund, all in violation of federal law, including the SEC

14   regulations. For a lengthy period of time, and especially in the six-month period prior to the

15   termination of Plaintiff, Capula engaged in a pattern of intimidation to prevent Plaintiff from

16   executing his compliance officer duties.

17   2.    In June 2025, Plaintiff raised concerns regarding "test trades" of a new trading strategy

18   to Head of Business Management, Paul Dersookiasian ("Mr. Dersookiasian"), and other

19   members of the firm's senior management. These test trades utilized investor funds in the MS

20   Fund and Plaintiff believed that these test trades posed potential risks to the MS Fund investor

21   funds. In accordance with his duties as the U.S. Chief Compliance Officer, Plaintiff directed a

22   temporary halt of the new strategy until those concerns were addressed. Instead of investigating

23   these concerns, Mr. Dersookiasian rejected them, berated Mr. Abramov for raising them, and

24   threatened to retaliate against Mr. Abramov by negatively evaluating his compliance

25   performance in a monthly formal internal "survey" submitted to Yan Huo ("Mr. Huo"),

26   controlling owner and principal of Capula, and to other members of the firm's senior

27   management. Mr. Abramov reported his underlying concerns and Mr. Dersookiasian's threat of

28   retaliation to Capula's Chief Executive Officer, Enrico Corsalini ("Mr. Corsalini") and Chief

COMPLAINT

Legal Officer, Jonathan Bloom ("Mr. Bloom"). The following day, Capula terminated Mr. Abramov's employment. This Complaint seeks redress for Capula's violation of New York Labor Law § 740 for a pattern of intimidating Mr. Abramov in the furtherance of his U.S. Chief Compliance Officer duties and for terminating Mr. Abramov's employment, all in retaliation for his protected whistleblowing activity.

**THE PARTIES**

3.      Plaintiff is an individual residing in the State of Connecticut. He was employed by Capula from June 18, 2012, until his termination on July 10, 2025. At the time of his termination, Mr. Abramov was U.S. Chief Compliance Officer and Head of U.S. Compliance and Legal at Capula.

4.      Defendant Capula Investment Management LLP is a limited liability partnership organized under the laws of England and Wales with its principal place of business in London, United Kingdom.

5.      Defendant Capula Investment US LP is a limited partnership organized under the laws of the State of Delaware with its principal place of business in New York, New York and is an employer within the meaning of the applicable state labor laws.

6.      Capula conducts substantial business in the State of New York.

**JURISDICTION AND VENUE**

7.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332 as Plaintiff is a citizen of the State of Connecticut and Capula resides and/or operates in the state of New York and the amount in controversy exceeds $75,000.

8.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendants reside and/or operate in this District and a substantial part of the events or omissions giving rise to the claims occurred in this District. Venue is also proper in this District because Defendants are subject to personal jurisdiction therein by virtue of substantial, continuous, and systematic commercial activities in this District. 28 U.S.C. § 1391(b), (c). Defendants "reside" in this District for venue purposes because Defendants are subject to personal jurisdiction in this District.

9.      Despite its foreign incorporation, this Court has personal jurisdiction over Defendant

COMPLAINT

CIM pursuant to New York Civil Practice Law and Rules ("CPLR") §§ 301 and 302(a), and under Federal Rule of Civil Procedure 4(k), because Defendant CIM purposefully availed itself of the privilege of conducting business in New York and established continuous and systematic contacts with the state sufficient to render it subject to suit here. Defendant CIM conducts substantial and continuous business within the State of New York, including: managing investment funds that are marketed to, and are held by, New York investors; operating and maintaining an affiliated U.S. entity and/or branch office in New York ("New York branch") for the purpose of investor relations, research, risk management, trading, portfolio management, compliance and trade financing; employing, supervising, directing and otherwise controlling staff (including Plaintiff), directors and partners (some of whom are also partners in Defendant CIM) based in New York and/or performing services for the New York branch; routinely conducting meetings, communications and transactions with New York-based financial institutions, counterparties, and regulators; and deriving substantial revenue from services performed and investments managed in New York. Defendant CIM purposefully directed its employment activities toward New York by recruiting and employing Plaintiff to work from New York, where Plaintiff performed all or substantially all of his job duties. Defendant CIM regularly communicated with Plaintiff in New York, issued, via its New York branch, pay through New York payroll systems, and required Plaintiff to interact with New York-based clients, financial partners, and regulators on its behalf. Defendant CIM also maintained ongoing and systematic contacts with New York sufficient to establish general jurisdiction under CPLR § 301, or, in the alternative, specific jurisdiction under CPLR § 302(a)(1) and (3), as Plaintiff's claims arise directly from Defendant's conduct and business activities within the state. Exercising personal jurisdiction over Defendant CIM in this District comports with due process because Defendant CIM's contacts with New York are deliberate, substantial, and such that it could reasonably anticipate being haled into court here to answer for employment-related disputes involving its New York-based personnel.

COMPLAINT

## STATEMENT OF FACTS

10.     On June 18, 2012, Mr. Abramov began his employment at Capula as U.S. Chief Compliance Officer and Head of U.S. Compliance and Legal and remained in these roles until his termination on July 10, 2025.

11.     As U.S. Chief Compliance Officer and U.S. Head of Compliance, Mr. Abramov was responsible for directing Capula's U.S. compliance program, developing and maintaining compliance with all U.S. state and federal regulatory laws, overseeing regulatory adherence, acting as Capula's liaison with U.S. regulators and instructing the firm on compliance matters relating to investigations, inquiries and other contacts by such U.S. regulators, and managing and instructing Capula on U.S. regulatory risks.

12.     As U.S. Head of Legal, Mr. Abramov was responsible for instructing the firm on U.S. contractual and Human Resources legal matters, as well as U.S. legal risks relating to such matters.

13.     As part of his compliance officer responsibilities, Mr. Abramov was tasked with ensuring that Capula's domestic operations, as well as its foreign operations involving U.S. investors and U.S.-regulated activities, followed the strict requirements of U.S. regulators, including the Securities and Exchange Commission ("SEC"), the Commodities Futures Trading Commission ("CFTC"), the National Futures Association ("NFA"), and multiple Exchange Regulators.

14.     Additionally, as U.S. Chief Compliance Officer, Mr. Abramov also had the responsibility of ensuring that fiduciary duties owed to Capula fund investors under the SEC regulations were adhered to and that investor funds were not misappropriated or placed at unnecessary risk.

15.     As detailed herein, on multiple and regular occasions during Mr. Abramov's tenure, management, officers, and principals of Capula attempted to restrict and impede Mr. Abramov's compliance officer duties, including his ability to ensure regulatory compliance and protection of investor funds, such as in the areas of fund management, fund administration, and trading. Management, officers, and principals of Capula engaged in a pattern of pressure and intimidation to dissuade Mr. Abramov from fulfilling his compliance officer responsibilities by approving activities that violated laws, rules, and regulations, as well as fiduciary responsibilities owed to

COMPLAINT

investor funds managed by Capula.

THE MS FUND PTE ISSUES

16.    In December 2021, Capula launched its Capula Multi-Strategy Master Fund Limited (the "MS Fund") which contained a "pass-through expense" ("PTE") structure pursuant to which Capula would be able to charge, without any limit, directly to the MS fund's underlying investors, including retirement plan investors subject to the Employee Retirement Income Security Act of 1974 ("ERISA"), a broad range of its operating "overhead" costs. The expenses charged by Capula to the MS Fund investors via the PTE mechanism included multi-million "sign-on" and compensation packages of Capula's portfolio managers, hundreds of thousands of dollars in placement agent costs for recruiting such portfolio managers, as well as significant compensation (totaling millions of dollars) for other Capula employees, partners and consultants who performed "work in relation to the MS Fund". In contrast to the MS Fund, Capula was not contractually permitted in other funds to charge these types of "overhead" expenses, and instead such "overhead" expenses relating to any other Capula funds were paid from Capula's fixed (i.e., capped) management fees that it collected from such other Capula funds.

17.    Capula induced investors to invest in the MS Fund with the uncapped PTE structure on the basis that by agreeing to allow Capula to charge these additional uncapped multi-million dollar expenses to the MS Fund investors (in lieu of typical, capped management fees), Capula would be able to retain the most talented, and generally highly compensated, portfolio managers, which would ostensibly deliver stronger returns for the investors. Therefore, the MS Fund's PTE structure, which was effectively financed by the fund's investors, allowed Capula to pay significantly higher compensation to its portfolio managers for managing the MS Fund's capital than the compensation that Capula paid out of its own fee revenue to portfolio managers for managing capital of other Capula funds.

18.    On multiple occasions during his tenure at Capula, including, without limitation, on or around February 21, 2024, May 28, 2024, and July 24, 2024, in fulfilling his compliance officer duties, Plaintiff conducted verbal and written communications with the firm's senior management, including Mr. Corsalini, Mr. Bloom, Samuel Lowe ("Mr. Lowe"), Chief Financial

COMPLAINT

Officer, Salil Dhawan ("Mr. Dhawan"), Co-Chief Operating Officer, Peter Warren ("Mr. Warren"), Co-Chief Operating Officer and Global Head of Investor Relations, and Carl Lindstrom ("Mr. Lindstrom"), Head of Finance, in relation to the SEC regulations with respect to disclosure of the expenses charged by Capula to investors in the MS Fund via the PTE mechanism. In fulfilling his compliance officer duties, Plaintiff emphasized that, under the SEC's federal regulations, Capula's expenses must be clearly and specifically disclosed to the investors in the relevant fund's offering prospectus <u>prior</u> to Capula initiating such charges. As part of his compliance communications, Plaintiff pointed out that the SEC had recently adopted even more stringent regulations regarding fund expenses and disclosures to ensure greater investor protection and prevention of inappropriate conduct by investment managers that would breach their fiduciary duties to investors.

19.    In his capacity as compliance officer, Plaintiff's concerns were heightened when, shortly following Plaintiff's February 21, 2024 communication referenced above, Mr. Lowe, who served as both the Chief Financial Officer and chairman of Capula's Expense Committee operating in London, requested via email on March 8, 2024 that, given "the heightened focus by SEC, and other regulators, in this expense pass-through area," Plaintiff engage outside counsel, Skadden, Arps, Slate, Meagher & Flom ("Skadden"), long-time primary US regulatory compliance counsel for Capula, or an external compliance consultant, the ACA Group, to conduct an "informal audit" of Capula's current process for charging Capula's expenses to the MS Fund investors via the fund's PTE mechanism (the "PTE Review").

20.    On or around March 15, 2024, Plaintiff and Mr. Lowe discussed Mr. Lowe's request for the PTE Review via telephone. On this call, Plaintiff, in fulfilling his compliance officer duties, attempted to discuss establishing access for him to review and pass along to Skadden a detailed record of the specific expenses that had been charged to the MS Fund investors. Mr. Lowe indicated that neither Plaintiff nor Skadden would be given access to the actual fund financial books detailing such expenses, but that the MS Fund's and Capula's auditor firm, Ernst & Young, had already reviewed the previous expenses charged to date to the MS Fund investors via the PTE process and that Mr. Lowe was "not concerned about that."  Mr. Lowe indicated

COMPLAINT

1    that the PTE Review should center only on the "going forward" process.

2    21.    Shortly after the PTE Review request by Mr. Lowe, Plaintiff became aware that

3    management was concerned that the expenses charged to date could be seen as outside the

4    disclosures that had been made to investors and that the PTE Review could have been initiated

5    as a cover for such practices. Plaintiff told Mr. Bloom that without being able to review the

6    expenses previously charged to the MS Fund investors, Plaintiff would be unable to fulfill his

7    compliance duties. This request was refused by Mr. Bloom.

8    22.    Plaintiff completed a due diligence analysis comparing Skadden's and ACA Group's

9    capabilities with respect to conducting the above expense allocation review and concluded that

10    Skadden's team, especially given the involvement of one of its partners who had formerly held

11    a senior role in the SEC enforcement division, was most suited for conducting the PTE Review.

12    Mr. Lowe, Mr. Lindstrom, and Mr. Bloom approved the retention of Skadden for the PTE

13    Review.

14    23.    On May 10, 2024, Plaintiff initiated the PTE Review with Skadden. Thereafter, Plaintiff

15    renewed his request to Mr. Lowe and Mr. Lindstrom to obtain full access to the internal

16    calculations of the prior PTE expenses. This request was again denied, with Mr. Lowe and Mr.

17    Lindstrom only providing "sample" calculations with respect to marketing expense allocations,

18    which Plaintiff indicated were inadequate.

19    24.    When Plaintiff asked Mr. Lowe to provide any documents detailing Ernst & Young's

20    "review" of prior Capula's expenses charged to the MS Fund's investors (which Mr. Lowe had

21    referenced on a call with Plaintiff on or around March 15, 2024), Mr. Lowe refused to provide

22    any such documentation, once again insisting that the PTE Review focus only on updating

23    disclosures and policies on a going forward basis instead of looking back at the expenses charged

24    to date because "Ernst & Young had already reviewed those expenses". This refusal was repeated

25    multiple times on calls between Mr. Lowe, Mr. Lindstrom and Plaintiff on March 15, 2024, May

26    29, 2024, and June 25, 2024.

27    25.    In approximately mid-August 2024, Plaintiff had a video call with Mr. Corsalini, Mr.

28    Bloom, Mr. Lowe and Mr. Warren, during which they told Plaintiff about management's new

COMPLAINT

intention to charge compliance-related expenses to the MS Fund investors. During that call, in fulfilling his compliance officer duties, Plaintiff warned that all compliance-related costs, including substantial compensation of the firm's compliance staff and consultants, must be disclosed to the investors <u>prior</u> to Capula initiating such charges.[1] Plaintiff underscored that the relevant SEC regulations were designed to protect fund investors given the inherent incentive for investment managers to shift their costs to investors. Mr. Corsalini strongly disagreed with Plaintiff and indicated that Plaintiff was not sufficiently "commercial" in his U.S. compliance role and did not understand the current "market practices" with respect to the PTE issue.

26.     On or around October 2, 2025, Mr. Lowe emailed Plaintiff to request that he include in the MS Fund prospectus disclosures regarding expenses for Artwork and Private Air Jet Travel – two categories of expenses that had not at all been discussed with Plaintiff and had not been previously disclosed to Plaintiff.

27.     Mr. Lowe requested unusual terminology: that the MS Fund disclosure should specify that such Artwork and Private Air Jet Travel expenses (together with certain other expenses) are currently "excluded" from the PTE charges (i.e., currently not charged to the fund). Mr. Lowe further stated in his email request to Plaintiff that "these exclusions have been implemented, <u>some since inception.</u>" As the firm's U.S. Chief Compliance Officer, Plaintiff was concerned by this unusual language because it implied that some undisclosed expenses had been previously charged to the MS Fund investors via the PTE mechanism.

28.     In fulfilling his compliance officer duties, Plaintiff asked Mr. Lowe which of these expenses Capula had only begun to exclude and which of the expenses Capula had been excluding from the PTE charges since the MS Fund's inception. Mr. Lowe confirmed that the Artwork and Private Air Jet Travel expenses had been charged to the MS Fund investors to date, but management now wishes to exclude the Artwork expenses completely and limit, but continue to charge, the Private Air Jet Travel expenses to the MS Fund investors.

29.     In multiple conversation between October 2024 and January 2025 regarding the PTE

[1] This directive was consistent with Capula's fiduciary and regulatory obligations under federal law, as reflected in the SEC's requirements and guidance, including the SEC's 2024 examination priorities.

expense issue, in fulfilling his compliance officer duties, Plaintiff instructed Mr. Corsalini, Mr. Bloom, Mr. Lowe, and Mr. Warren that, in addition to needing to disclose the compliance-related expenses that Capula now intended to charge to the MS Fund investors on a going forward basis, pursuant to Capula's fiduciary duties under the SEC regulations, Capula must now notify the MS Fund investors regarding any expenses that had previously been charged to them by Capula without their knowledge, including Artwork and Private Air Jet Travel. As the firm's U.S. Chief Compliance Officer, Mr. Abramov also informed them that, pursuant to Capula's fiduciary duties under the SEC regulations, such undisclosed expenses must be reimbursed to the investors in the MS Fund. Plaintiff was told he was raising immaterial issues and was referred to on multiple occasions as not "commercial." Thereafter, Plaintiff was essentially "cut out" from information sharing and further discussions in relation to the issues concerning disclosure of those MS Fund/PTE expenses or any remedial action to reimburse investors.

30.    During an annual performance review conducted by Mr. Bloom with Plaintiff via telephone on October 30, 2024, Mr. Bloom indicated to Plaintiff that management was quite unhappy with Plaintiff's handling of the PTE issues and that new management, specifically, Mr. Corsalini, believed that Compliance must be more "commercial." Mr. Bloom informed Plaintiff that if Plaintiff failed to dramatically change his "inflexible" compliance approach, Mr. Corsalini would restructure U.S. Compliance to get Compliance in the U.S. "off his back", that it would impact Plaintiff future- and compensation-wise, and that Plaintiff's role and compensation would be severely diminished. Plaintiff defended his compliance-related actions and instructions, indicating that, as the firm's U.S. Chief Compliance Officer, he was acting appropriately and would continue to carry out his independent compliance oversight duties as he had done at Capula for over 12 years.

31.    Following the October 30, 2024 meeting with Mr. Bloom, Mr. Bloom published an appraisal consistent with his statements to Plaintiff: ". . . in the context of potential scaling up and expansion into new strategies and trading instruments as part of the Multi Strategy initiative, Igor needs to ensure that he is well prepared and has the benefit of recent network soundings on best practice from a regulatory compliance perspective. The business' change of stance on

COMPLAINT

1    expensing compliance costs is a case in point."

2    32.    On a telephone call with Mr. Bloom in or around mid-January 2025, in fulfilling his

3    compliance officer duties, Plaintiff re-iterated his position from their October 30, 2024 call

4    regarding the need for complete disclosure of compliance expenses and remedial actions with

5    respect the Artwork and Private Air Jet Travel expenses previously charged to the MS Fund

6    investors and that Plaintiff believed that such remedial actions were not completed. Plaintiff also

7    indicated to Mr. Bloom that management had completely "cut out" Plaintiff from discussions

8    regarding this issue. Mr. Bloom informed Plaintiff that, after their discussion, he was shocked

9    that Plaintiff was raising this issue yet again, that it would be "handled", and that this issue was

10    not to be further addressed by Plaintiff or else there would be "repercussions".

11    THE CROSS TRADING ISSUES

12    33.    As the investment manager of Capula funds, Capula, similar to other fund investment

13    managers, has full discretion in allocating capital of each fund to Capula's portfolio managers

14    for investment purposes ("capital allocations") and frequently makes such capital allocations.

15    34.    Historically, Capula's portfolio managers from time to time cause certain Capula funds,

16    including the MS Fund and the GRV Fund, to enter into "cross-trades", where one Capula fund

17    sells its investment portfolio holdings to another Capula fund.

18    35.    When Capula implements, or "executes", a "cross trade" on behalf of both funds involved

19    in such transaction, there is a potential for an inherent conflict of interest because the relevant

20    Capula portfolio manager, as well as Capula, could be incentivized to execute a particular cross

21    trade for the benefit of one fund (and/or for the personal benefit of such portfolio manager or

22    Capula) and to the detriment of the second fund involved.

23    36.    This conflict becomes clear when the portfolio manager's compensation in relation to

24    one fund involved in a cross trade transaction is higher than the portfolio manager's

25    compensation received  in relation to the other fund on the opposite side of the same transaction,

26    and/or where the specific compensation of the portfolio manager can be charged via a PTE

27    mechanism to one fund but not the other. Therefore, to mitigate such conflict of interest and to

28    ensure that Capula complies with its fiduciary obligations and the SEC regulations under federal

COMPLAINT

1    law, Capula implemented a cross trading policy that requires a cross trade to be executed only if

2    it is in the best interest of, and equitably benefits, both funds involved in such transaction (i.e., a

3    requirement that such trades be fair and equitable).

4    37.    On a telephone call with Mr. Corsalini and Mr. Bloom on or around April 1, 2025,

5    Plaintiff learned that, for approximately several years prior to this call, certain capital allocations

6    of the GRV Fund's capital were not in fact made to benefit the GRV Fund, but rather to benefit

7    certain portfolio managers as well as Capula. Namely, Capula used the GRV Fund's capital

8    allocations as a temporary incentive (a "sweetener") for portfolio managers to join Capula for

9    the primary purpose of managing the MS Fund once the MS Fund's capital size would reach a

10    sufficient level. The portfolio managers would be able to earn significantly greater compensation

11    for managing the assets of the MS Fund than the assets of the GRV Fund, due to the MS Fund's

12    PTE mechanism which provided that the portfolio managers' compensation (including their

13    "sign on" incentive packages and related recruiting costs) directly charged to the MS Fund

14    investors. Thus, Capula would be able to charge multi-million dollar compensation, without any

15    cap, to the MS Fund investors, instead of having to pay such compensation out of its own capped

16    fee revenue.

17    38.    Furthermore, Plaintiff learned on this call that various "cross trades" executed by

18    Capula's portfolio managers between the GRV Fund and the MS Fund were inaccurately

19    presented to the firm's Compliance Department ("Compliance"), including Plaintiff (who

20    previously approved these trades), as being executed for the economic benefit, and in the best

21    interest of, both funds.  However, in this call Plaintiff learned that these "cross trades" were not

22    in fact in the best interests of both funds. Rather, such "cross trades" were entered into for (1) a

23    specific benefit of the portfolio managers executing such cross trades, so that they could receive

24    beneficial capital allocations in the MS Fund and, hence, be paid significantly higher

25    compensation for managing the MS Fund assets than for managing the GRV Fund assets, and

26    (2) a specific benefit of Capula so that Capula would be able to charge such multi-million dollar

27    compensation (without any cap) to the MS Fund investors, instead of having to pay such

28    compensation out of its own capped fee revenue, as is the case with the GRV Fund.

COMPLAINT

39.     During this call, in fulfilling his U.S. Chief Compliance Officer duties, Plaintiff indicated that he believed that the aforementioned cross trading and capital allocation activities of Capula involving the MS Fund and the GRV Fund assets violated the SEC regulations and Capula's fiduciary duties thereunder, and that Capula should (1) immediately cure this by fully disclosing such past activities and associated conflicts of interest to the GRV Fund and MS Fund investors, (2) closely consider whether any restitution was owed by Capula to all relevant investors for any damages they might have incurred as a result of these activities, and (3) cease such activities on going forward.

40.     Following this call, Plaintiff was copied on two emails containing an exchange of proposed disclosure language for the MS Fund offering prospectus regarding the above problematic cross trading and capital allocation activities. Plaintiff felt the proposed language was inappropriate. Importantly, Mr. Abramov noted that the language failed to specify that Capula had been engaging in these problematic activities prior to such disclosure.

41.     At an in-person meeting with Mr. Corsalini on or around April 16, 2025, in fulfilling his U.S. Chief Compliance Officer duties, Plaintiff reiterated to Mr. Corsalini his strong concern regarding potential cross trading and capital allocation compliance violations, and Plaintiff strongly requested that the remedial actions that he previously outlined be implemented by Capula without further delay. As compliance officer, Plaintiff also informed Mr. Corsalini that the draft disclosure language was inadequate to address this significant regulatory problem. Plaintiff informed Mr. Corsalini that, as a U.S. compliance officer, he believed that the SEC would believe these cross trading and capital allocation activities to benefit Capula and its portfolio managers at the expense of the GRV Fund investors, which included, among others, individuals and pension ERISA investors.

42.     Mr. Corsalini's response to Plaintiff was heated and negative. Mr. Corsalini told Plaintiff that Mr. Bloom had informed Mr. Corsalini that Mr. Bloom had warned Plaintiff that he had been far too non-commercial in his compliance positions, and that Plaintiff was constantly meddling in Capula's business affairs and was again causing problems by way of raising the cross trading and capital allocation compliance concerns. Mr. Corsalini said that he did not know

COMPLAINT

1   why Capula had kept someone like Plaintiff around for so long, and that he was shocked by

2   Plaintiff's "lack of understanding" that the current SEC "was not really enforcing anything".

3   43.     Plaintiff told Mr. Corsalini that for many years he had a positive relationship with Capula

4   management, but now it was clear he was being "cut out" from important internal discussions

5   and information sharing, and that the limited selective sharing of information from management

6   suggested to Plaintiff that management wanted to use Plaintiff only as a "regulatory cover"

7   without any real compliance function.

8   44.     After the April 16, 2025, meeting with Mr. Corsalini, Plaintiff was not included in any

9   further discussions or email communications regarding the cross-trading and capital allocation

10   issues described above.

11   45.     In April 2025, Plaintiff attempted to travel to Capula's headquarters in London (similar

12   trips had been regularly approved in the past) to directly speak to members of management in

13   person about the recently strengthened attempts to limit Plaintiff's compliance role. Plaintiff's

14   trip was denied by Mr. Bloom and Mr. Corsalini, and the denial was documented in emails on

15   or around April 30, 2025, and May 6, 2025.

16   46.     Mr. Corsalini briefly visited the Capula New York office in May 2025. At an in-person

17   meeting with Mr. Corsalini on or around May 12, 2025, Plaintiff again reiterated his strong

18   concern regarding potential cross trading and capital allocation compliance violations, and

19   Plaintiff again strongly stated that remedial actions that he previously outlined should have been

20   implemented by Capula without further delay. Plaintiff indicated to Mr. Corsalini that he had no

21   knowledge whether the draft disclosure updates regarding capital allocations and cross trades

22   (which were originally copied to Plaintiff) were ever finalized, and it appeared that management

23   had completely "cut out" Plaintiff from all communications regarding this issue.

24   47.     On subsequent telephone calls with Mr. Corsalini in June 2025, Plaintiff reiterated to Mr.

25   Corsalini that Plaintiff had been "cut out" from all communications regarding the above-

26   mentioned cross-trading and capital allocation matters.

27   THE EMPLOYMENT CONTRACT ISSUES

28

COMPLAINT

48.    For a number of months, at the direction of Mr. Corsalini, Capula requested that Plaintiff agree to execute a new notice period/non-compete agreement that would extend Plaintiff's contractual time to remain at Capula after a resignation for a six-month period. The notice period in Plaintiff's prior agreement with Capula for the past 12+ years had been only thirty days. There were extended negotiations regarding this new agreement, which continued on and off for several months. This notice period extension issue was brought to the forefront in June 2025 by Mr. Corsalini following the above-mentioned acrimony which had taken place regarding the issues relating to Capula's PTE charges to the MS Fund investors and Capula's cross trading and capital allocation activities involving the MS Fund and the GRV Fund investor assets.

49.    Mr. Corsalini spoke with Plaintiff via telephone on June 10, 2025, and June 16, 2025. On these calls, Mr. Corsalini pressured Plaintiff to sign the notice period extension agreement and indicated that Plaintiff was already in "hot water" and needed to cooperate. Plaintiff told Mr. Corsalini that, given Mr. Bloom's threats to cut Plaintiff's compensation for 2025, he was concerned that, by signing this new agreement, Capula would lock him into a much longer notice period while cutting his compensation for not being adequately "commercial". Given the strong pressure and intimidation from Mr. Corsalini, Plaintiff told Mr. Corsalini that he would agree to such longer notice period if Capula elevated his title such that management would agree to allow him to effectively carry out his compliance duties and would publicly evidence its support for Plaintiff's role and his future longevity at the firm. When Mr. Corsalini refused this option, Plaintiff alternatively offered to agree to the longer notice period if Capula would guarantee Plaintiff's total compensation (including bonus) for the 2025 calendar year. Thus, if after executing the agreement, Plaintiff's year-end bonus (which historically constituted approximately 80% of his annual compensation) were significantly cut or eliminated as retribution for his compliance activities, Plaintiff's resignation thereafter would ensure that Plaintiff was, at least, compensated for the 2025 full year period. This suggestion was also rejected by Mr. Corsalini. Both these suggestions were rejected by Mr. Bloom on a call on or about June 17, 2025 where Mr. Bloom told Plaintiff that "we are not going to reward someone who works against us".

COMPLAINT

THE TEST TRADES ISSUES

50.    In June 2025, Capula intended to launch a new convertible bonds trading strategy for use by investor funds in the MS Fund.

51.    On June 16, 2025, Capula launched this new strategy by conducting a "test trade" using investor funds. The execution of such "test trade" was approved by multiple relevant departments of Capula, including the Operations Department ("Operations") and Business Management Department ("Business Management"). The Compliance Department, which included Plaintiff, approved such test trade on the assumption that these other departments had thoroughly resolved their issues in the functionality of all aspects of the strategy before issuing their own approvals for the "test trade", and that such "test trade" would be executed simply to confirm that the strategy has indeed been properly implemented.

52.    On June 16, 2025, Business Management notified Compliance, including Plaintiff, that certain operational issues had been identified as result of the "test trade". Plaintiff identified compliance concerns stemming from these operational issues and requested in writing that Business Management and Operations promptly resolve such issues.

53.    On June 17, 2025, Business Management notified Compliance, including Plaintiff, that a second "test trade" was undertaken on June 17, 2025 by the trading team under Business Management's oversight, using investor funds, and that several additional significant operational issues had arisen as a result of such "test trade". This second "test trade" was executed even though some of the issues identified with the first "test trade" (executed on June 16, 2025) had not yet been resolved. Business Management also indicated that they intended to execute straightaway another "test" trade.

54.    Plaintiff reviewed the second "test trade" of this new strategy and identified significant regulatory compliance concerns and risk to investor funds. In consideration of the fact that these "test trades" were executed using investor funds, Plaintiff, in fulfilling his compliance officer duties, promptly escalated his concerns in writing to Mr. Dersookiasian and other members of senior management.

55.    On June 17, 2025, to prevent Capula from causing significant regulatory non-compliance

16

COMPLAINT

and placing investor funds at unnecessary risk, Plaintiff, acting within his independent compliance oversight authority and fulfilling his compliance officer duties, urgently withdrew his prior approval and directed that the trading of this new convertible bond strategy (i.e., further "test trades") be immediately paused until the issues that Plaintiff had identified were resolved and a more complete pre-launch review was performed and documented across all relevant departments, so that investor funds would be protected and in adherence with regulatory guidelines.[2]

56.    On or around June 19, 2025, Mr. Dersookiasian contacted Plaintiff and berated him for delaying the roll out of the new trading strategy, and more specifically in pausing the planned additional "test trades". Mr. Dersookiasian also informed Plaintiff that Mr. Huo, Mr. Corsalini, and other members of senior management were very unhappy with Plaintiff's decision to pause.

57.    Although Plaintiff expressed to Mr. Dersookiasian that Capula risked significant non-compliance issues with federal law by proceeding without implementing corrective measures, Mr. Dersookiasian rejected his concerns.

58.    Mr. Dersookiasian declined Plaintiff's request for an individual meeting to address his concerns, as well as his multiple requests for additional pre-launch analysis.

59.    Mr. Dersookiasian challenged Plaintiff's compliance directive to temporarily halt this new strategy, insisting that not only such directive was wrong but also that Plaintiff had no authority to pause further "test trades" because, per Mr. Dersookiasian, the underlying issues that had been identified in relation to the two "test trades" were operational, rather than compliance issues.

60.    Mr. Dersookiasian and members of his Business Management team indicated that, typically, they had  not informed Compliance of any operational issues in connection with new strategy launches and that though they did inform Compliance (along with other relevant departments) of operational issues in connection with the specific launch of this new convertible

---

[2] This directive was consistent with Capula's fiduciary and regulatory obligations under federal law, as reflected in the SEC's requirements and guidance, including the SEC's 2025 examination priorities. Proceeding without these corrective measures would have risked non-compliance with federal law.

COMPLAINT

bond strategy, this was unintentional since such large number of operational issues would only raise "unnecessary" concerns for Compliance and might appear to be more "problematic" than really existed.

61.    On or around June 23, 2025, Business Management and Operations confirmed that almost all of the issues identified in the prior week had been resolved and the remaining couple of issues would be manually managed by Operations until the relevant processes were fully automated.

62.    Furthermore, Business Management and Operations assured Plaintiff that all relevant departments, including Operations, had worked out their issues in the functionality of all aspects of the strategy and that no further issues were expected in connection with the launch of this strategy.

63.    Given such unequivocal representations and assurances from Business Management and Operations, Plaintiff re-issued his U.S. compliance approval on the condition that Operations carefully oversee the aforementioned manual processes until they were successfully automated.

64.    On or around July 7, 2025, Mr. Dersookiasian escalated his displeasure of Plaintiff's prior conduct. Mr. Dersookiasian explicitly threatened both Plaintiff and Capula's Global Chief Compliance Officer, Michelle Bedwin, that he intended to submit significant negative survey ratings of the Compliance department, and specifically of Plaintiff, to Mr. Huo and other members of the firm's senior management.

65.    On July 9, 2025, fulfilling his compliance officer obligations and exercising protected rights under applicable whistleblower laws, Plaintiff escalated both the compliance concerns and the retaliation threat directly to Mr. Corsalini, the firm's Chief Executive Officer, and Mr. Bloom, the firm's Chief Legal Officer.

66.    The very next day, July 10, 2025, Mr. Bloom, along with the Chief People Officer, Nicole DePuy, terminated Plaintiff's employment with thirty days' notice.

**FIRST CAUSE OF ACTION**
*Retaliation for Whistleblowing Activity*
New York Labor Law § 740

67.    Plaintiff repeats and re-alleges each allegation as if fully set forth herein.

68.     Plaintiff engaged in protected activity under NYLL § 740.

69.     The pattern of repeated attempts by management, officers, and principals of Defendants during the term of Mr. Abramov's employment to intimidate Mr. Abramov and to pressure him to violate and to cause Capula to violate laws, rules and regulations and fiduciary responsibilities constituted a breach of NYLL § 740(1)(e).

70.     Defendants' swift termination of Plaintiff's employment one day following his escalation report constitutes "retaliatory action" under NYLL § 740(1)(e).

71.     As a direct and proximate result of Defendants' termination of Plaintiff's employment, Plaintiff has suffered, and will continue to suffer, damages, including without limitation lost earnings, reputational damage, harm to his future employment prospects and emotional distress.

72.     Defendants' conduct has been intentional, deliberate, willful, malicious, and reckless, constituted a high degree of moral turpitude and wanton dishonesty, and has been carried out in callous disregard of the rights of Plaintiff, therefore entitling him to punitive damages.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgement against Defendants as follows:

A.     An award for actual and compensatory damages, including lost wages, earnings (including, without limitation, deferred earnings), employee benefits, reputational damage, emotional distress, liquidated damages, and all other sums of money, together with interest on these amounts and according to proof;

B.     For general, special and incidental damages, according to proof;

C.     Pre-judgment and post-judgment interest, as provided by law;

D.     Punitive damages;

E.     Attorneys' fees and costs under applicable law, including expert fees and costs; and

F.     Such additional and further relief as this forum may deem just and proper.

COMPLAINT

1

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all causes of action and claims with respect to which he has a right to jury trial.

Dated:  November 3, 2025
New York, New York

Respectfully submitted,

_____

**THE OTTINGER FIRM, P.C.**
Robert W. Ottinger
Olivia Davis
Allison Marculitis
195 Montague Street, 14th Floor
Brooklyn, NY 11201
Tel: 212-571-2000
robert@ottingerlaw.com
olivia@ottingerlaw.com
allison@ottingerlaw.com
*COUNSEL FOR PLAINTIFF*

20

COMPLAINT